MARBLEY, D.J., delivered the opinion of the court, in which MARTIN, J., joined. GIBBONS, J. (pp. 408-15), delivered a separate opinion concurring in part and dissenting in part.
AMENDED OPINION
ALGENON L. MARBLEY, District Judge.
Defendant-appellant Demetrion Gross appeals the criminal judgment and 180-month sentence issued by the district court upon his guilty plea to being a felon in possession of a firearm. Gross challenges the district court’s denial of a motion to suppress evidence based on an alleged unlawful seizure. He also disputes the determination that he was an armed career criminal under 18 U.S.C. § 924(e), arguing that a prior conviction for escape was not necessarily a “violent felony” under the Armed Career Criminal Act (“ACCA”).
For the following reasons, we affirm the district court’s denial of Gross’s motion to suppress as to the DNA swab and confession, reverse the district court’s denial of Gross’s motion to suppress as to the firearm, vacate the sentence imposed, and remand to the district court for further proceedings.
I.
In the early morning hours of November 15, 2007, Cuyahoga Metropolitan Housing Authority Police Officer Eric Williams was on general patrol of high-crime areas of high- and low-rise public housing. While passing through the parking lot of one of the housing complexes, Williams encountered a legally parked Oldsmobile automobile with the engine running but no apparent driver. Williams, however, noticed a barely-visible passenger who was slumped down in the front-passenger seat of the vehicle. He checked the vehicle’s license plates against an electronic database and discovered that there were no outstanding warrants or issues related to the owner of the car. Williams then parked his police vehicle directly behind the Oldsmobile and turned on his vehicle spotlights. He observed the passenger react to the spot *397 lights by sitting up abruptly and then slumping down further in his seat. Williams then exited his police vehicle and approached the passenger side of the Oldsmobile by foot.
Williams encountered Gross sitting in the passenger seat and introduced himself by speaking through the closed passenger window. Gross then cracked the door to speak to Williams. Williams asked what he was doing in the area, and Gross replied that he was “over [at] his girlfriend’s house.” During the course of the conversation, Williams noticed a partially consumed bottle of Remy Martin cognac located on the passenger side of the center console. When Williams asked for identification, Gross said that he did not have any identification on him but he could get it if he could go into the house. Williams advised that it would not be necessary to do so if Gross would provide his name, date of birth, and social security number. After Williams asked for them several times, Gross verbally gave Williams his identifying details.
Williams ran a warrant check, which revealed that Gross had an outstanding felony warrant for carrying a concealed weapon. He then advised Gross that he was under arrest, asked him to step from the vehicle, and took Gross into custody by handcuffing him. Williams briefly patted down Gross but did not conduct a search incident to arrest at the scene. Williams then transported Gross to the sheriffs department.
When Williams and Gross arrived at the sally port of the sheriffs department, Gross was searched again and passed through a metal detector. The metal detector went off, but, despite repeated attempts to locate the metal object triggering the detector and repeated passes through the machine, the officers were unable to locate the source of the problem. Gross was then escorted into the police bullpen, where he immediately asked to use the restroom. Gross entered a restroom pod that obscured Williams’s view of Gross from the shoulder down.
A short time later, officers discovered a .380 caliber firearm near the toilet that Gross had used. An investigation into how the firearm entered the jail revealed that Gross was the only inmate from the street to have access that day to the pod where the gun was located. On November 19, 2007, four days after Gross’s arrest, and while Gross was still detained, officers advised Gross of their investigation of the firearm and informed him of his Miranda rights. Gross then waived his Miranda rights, said that he knew who brought the weapon into the jail, but denied that it was his. The officers requested that Gross consent to a DNA test, but Gross refused. The following day, a search warrant was obtained to take an oral swab for the collection of DNA evidence. After taking the swab, DNA analysis revealed that genetic material taken from the firearm and its ammunition matched Gross’s DNA.
On January 17, 2008, approximately two months after his arrest and while still detained, Gross, of his own accord, contacted Bureau of Alcohol, Tobacco, and Firearms Agent (ATF) Kimani Howell, to whom he had been previously introduced, and requested a meeting. On January 18, 2008, Agent Howell met with Gross and again advised him of his Miranda rights. Gross again waived his Miranda rights and gave a statement admitting to bringing the firearm into the police bullpen.
Gross was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Gross initially entered a plea of not guilty. He then filed a motion to suppress “all evidence obtained after the initial stop of the Defendant ... that the government in *398 tends to introduce at trial.” Gross’s suppression motion was denied by the district court.
Gross thereafter pled guilty pursuant to a written plea agreement with the government. In the plea agreement, Gross reserved the right to appeal the district court’s denial of his motion to suppress. The plea agreement also noted that one of the bases for his eligibility for a 15-year minimum sentence under the Armed Career Criminal Act might be impacted by a legal question then pending before the Supreme Court. That question dealt with whether an escape conviction based on a failure to report qualified as a violent felony under the Act. See Chambers v. United States, 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009). The plea agreement therefore provided:
If the presentence report determines that the defendant’s escape convictions, which are referenced in the Indictment, rest solely on his failure to report to a penal institution or halfway house and the Supreme Court determines that an escape conviction based solely on the failure to report does not qualify as a violent felony, then the defendant understands that he will not be an Armed Career Criminal, as that term is defined in 924(e)(1). In that case, the defendant agrees that his base offense level will be 24 pursuant to [United States Sentencing Guidelines (“U.S.S.G.”) ] Section 2K2.1.
The district court concluded that Gross was an armed career criminal under 18 U.S.C. § 924(e) and, pursuant to U.S.S.G. § 4B1.4, sentenced Gross to 180 months imprisonment concurrent with a state sentence then being served. Gross timely filed a notice of appeal.
II.
When reviewing the denial of a motion to suppress, we review the district court’s findings of fact for clear error and its conclusions of law de novo. United States v. Gross, 550 F.3d 578, 582 (6th Cir.2008) (citing United States v. Simpson, 520 F.3d 531, 534 (6th Cir.2008)). We further review de novo “the district court’s determination as to whether certain facts establish a seizure or detention in violation of the Fourth Amendment.” United States v. Waldon, 206 F.3d 597, 602 (6th Cir.2000); see also Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (“[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal.”). “When a district court has denied the motion to suppress, we must ‘consider the evidence in the light most favorable to the government.’ ” United States v. Pearce, 531 F.3d 374, 379 (6th Cir.2008) (quoting United States v. Carter, 378 F.3d 584, 587 (6th Cir.2004) (en banc)).
A.
“This Court has explained that there are three types of permissible encounters between the police and citizens: ‘(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.’” Waldon, 206 F.3d at 602 (quoting United States v. Avery, 137 F.3d 343, 352 (6th Cir.1997)).
Although “[l]aw enforcement officers do not violate the Fourth Amendment’s prohibition of unreasonable seizures” by approaching individuals in public places and asking questions, United States v. Drayton, 536 U.S. 194, 200, 122 S.Ct. *399 2105, 153 L.Ed.2d 242 (2002), a consensual encounter becomes a seizure when “in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.” United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); see also Florida v. Bostick, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (“[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual’s identification; and request consent to search his or her luggage — as long as the police do not convey a message that compliance with their request is required.” (citations omitted)); United States v. Peters, 194 F.3d 692, 698 (6th Cir.1999) (“Absent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, the [officer’s] request for additional identification and voluntarily given information from the defendant does not constitute a seizure under the Fourth Amendment.”). Factors that, if present, indicate that a seizure occurred include “the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer’s request might be compelled.” Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870.
To justify a brief, investigative stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an officer must point to specific, articulable facts that gave rise to a “reasonable suspicion” that the suspect was engaged in criminal activity. Id. at 21, 88 S.Ct. 1868. “A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has ‘a particularized and objective basis for suspecting the particular person stopped of criminal activity.’ ” United States v. Baldwin, 114 Fed.Appx. 675, 679 (6th Cir.2004) (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). The officer “must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.” United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citations and internal quotation marks omitted).
Gross argues that it was improper for Williams to approach the parked vehicle in which Gross was sitting without some reasonable suspicion. According to Gross, Williams’s act of parking his marked police car directly behind the Oldsmobile, thereby blocking the car in the parking space, would cause a reasonable person not to feel free to leave the area and therefore constituted a Terry stop. He also contends that, at the time Williams parked his police car behind the vehicle in which he was sitting, Williams had already observed that the vehicle was legally parked and, based upon the check of an electronic database, knew that there were no outstanding warrants or issues related to the owner of the car. Gross asserts, therefore, that there was no reasonable suspicion to approach the vehicle.
Gross is correct that when Officer Williams blocked the car in, he began an investigatory Terry stop. We recently held that a similar act by this same Officer Williams was a warrantless Terry seizure requiring reasonable suspicion. See United States v. See, 574 F.3d 309, 313 (6th Cir.2009). In See, Officer Williams was on patrol in a public-housing parking lot when he noticed a car that was backed into a parking space in a dimly lit area farther from the building than other vacant spots. Id. at 311. Williams then pulled his patrol car in front of See’s ear and parked so that See could not move his vehicle. Id. at 312. *400 We held that “the blocking of See’s car to determine the identity of the occupants and maintain the status quo while obtaining this information was a warrantless Terry seizure ... [because] a reasonable person in See’s position would not have felt free to leave.” Id. at 313 (citations and internal quotation marks omitted). Because Williams’s actions here were markedly similar to his actions in See, he initiated a Terry stop requiring reasonable suspicion.[1]
It is readily apparent that, under the circumstances, Williams did not have a particularized and objective basis for suspecting Gross of criminal activity at the time of the stop. Indeed, Williams admitted at the suppression hearing that “at the time [he] exited the car, it [was] safe to say that [he was not] aware that there was any crime being committed.” The government does not argue that Williams had a reasonable suspicion to block or to approach the car. Rather, the government asserts that, in light of the fact that Williams observed a vehicle parked in a public parking lot with the engine running and no driver behind the wheel in the early hours of the morning with a passenger “slumped down” in the front passenger seat, Williams’s “community-caretaking” function required him to investigate the facts further. See United States v. Roger, 152 Fed.Appx. 429, 430-31 (6th Cir.2005); United States v. Williams, 354 F.3d 497, 508 (6th Cir.2003) (“As the Supreme Court has explained, the community caretaking function of the police applies only to actions that are ‘totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.’ ” (quoting Cady v. DombrowskI 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973))); Taylor v. Mich. Dep’t of Natural Res., 502 F.3d 452, 462 (6th Cir.2007) (“Case law indicates that the community caretaking function articulated in Cady has been principally applied to warrantless searches of automobiles.”).
The government relies on Roger for the proposition that a community-caretaking purpose justified a Terry stop in this case. This reliance, however, is misplaced. In Roger, the arresting officer approached a running vehicle that was illegally stopped and partially blocking a local highway. 152 Fed.Appx. at 430. The officers observed Roger asleep or unconscious in the driver’s seat and knocked on the driver’s window. When Roger rolled down his window, the officers noticed the strong odor of marijuana, asked Roger for his license, and a computer check revealed that his license was suspended. A subsequent consensual search of the vehicle uncovered drugs and a firearm. We upheld the district court’s denial of Roger’s suppression motion, and, in doing so, we mentioned the magistrate judge’s alternative rationale for denial based on the officer’s “community caretaker” function. Id. It is important to note, however, that the magistrate judge concluded that the “initial approach to the car was lawful ... [because] the deputies had probable cause to approach the vehicle and investigate the situation in that the vehicle [illegally] obstructed traffic.” Id. The readily apparent *401 illegality that was present in Roger, therefore, distinguishes that case from the nonthreatening and lawful circumstance presented here of a passenger seated in a parked car waiting outside a housing complex. Furthermore, any purported community-caretaking function in this instance could have been accomplished through a consensual encounter rather than an investigative stop. See See, 574 F.3d at 315 (Gilman, J., concurring) (“Officer Williams had every right to investigate further, but he should have simply parked his patrol car alongside See’s vehicle to carry out the investigation in a consensual manner. Instead, he parked his patrol car in such a way so as to block in See’s vehicle, thus transforming the encounter into a Terry stop.”).
Accordingly, because Officer Williams was unable to articulate a reasonable suspicion for the investigative stop, it constituted an unlawful seizure of Gross.
B.
The illegality of the stop, however, does not end the suppression analysis. We must consider whether the evidence to have been introduced against Gross, including the firearm, the DNA test, and Gross’s confession, must be suppressed under the exclusionary rule.
The animating purpose underlying the exclusionary rule is the deterrence of unlawful government behavior. Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (exclusionary rule’s “purpose is to deter — to compel respect for the constitutional guaranty in the only effectively available way— by removing the incentive to disregard it.”). The Supreme Court has “declined to adopt a ‘per se\ or ‘but for,’ rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest.” United States v. Ceccolini, 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (citing to Brown v. Illinois, 422 U.S. 590, 608, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). Rather, “the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality.” New York v. Harris, 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). Where, as here, the three pieces of evidence were obtained after Gross was arrested and detained pursuant to an outstanding arrest warrant, the relevant question is whether each piece of evidence was obtained “by means sufficiently distinguishable to be purged of the primary taint.” Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); see also United States v. Hudson, 405 F.3d 425, 440 (6th Cir.2005) (quoting Wong Sun); United States v. Castillo, 238 F.3d 424 (Table), 2000 WL 1800481, at *5-6 (6th Cir. Nov. 28, 2000) (concluding that a suspect’s fleeing an unlawful detention dissipated the taint that might have resulted from his detention, rendering admissible the drug evidence found incident to his arrest for flight). Accordingly, we must consider whether “the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the ‘taint’ imposed upon the evidence by the original illegality.” United States v. Crews, 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). In doing so, we consider all relevant factors “such as the length of time between the illegal seizure and the [discovery of evidence or the confession], the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read the suspect his Miranda rights before he [confessed].” United States v. Lopez-Arias, 344 F.3d *402 623, 630 (6th Cir.2003) (citing Kaupp v. Texas, 538 U.S. 626, 632-33, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003), and Brown, 422 U.S. at 603-04, 95 S.Ct. 2254). No single factor in this analysis, however, is dispositive of attenuation. Brown, 422 U.S. at 603, 95 S.Ct. 2254.
In view of the time that elapsed between the unlawful seizure of Gross in the parked car and Gross’s subsequent voluntary confession, the first factor weighs significantly toward attenuation.[2] Gross’s voluntary confession occurred approximately two months later, on January 18, 2008. Having already been advised of his Miranda rights and having signed a written waiver of those rights, Gross notified ATF agents that he wished to speak with them regarding how the firearm made its way into the jail. Agent Howell advised Gross a second time of his Miranda rights, Gross signed another written waiver of those rights, and only then did Gross admit to bringing the firearm into the jail. The significant length of time between the unlawful seizure of Gross and his voluntary confession while in lawful police custody on an outstanding arrest warrant counsels a finding of attenuation in this ease as to the confession. See United States v. Akridge, 346 F.3d 618, 628 (6th Cir.2003) (finding “most dispositive,” in a suppression analysis, “the degree of free will exercised” by defendants in giving incriminating statements following an illegal search of their home and “the temporal attenuation” created by a one-month gap between the search and questioning); Brown, 422 U.S. at 602, 95 S.Ct. 2254 (requiring that a statement made following an illegal arrest be both voluntary and “sufficiently an act of free will to purge the primary taint” to be admissible); Harris, 495 U.S. at 20, 110 S.Ct. 1640 (“We do hold that the station house statement in this ease was admissible because Harris was in legal custody ... and because the statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else.”). The district court did not err in denying Gross’s motion to suppress the confession as it was sufficiently attenuated from the initial illegal seizure because of its voluntary nature made clear by the amount of time that passed and Gross’s initiation of the meeting with ATF agents.
As to the second factor — the presence of intervening circumstances — there were intervening circumstances that served to sever the chain linking the unlawful detention and the DNA swab, further dissipating any taint. The DNA swab was only taken after a valid search warrant was obtained in order to swab Gross. The remaining piece of evidence is the firearm. Central to the determination of whether the firearm was purged of the taint of the illegal stop is whether the discovery of the *403 warrant constituted an intervening circumstance. We hold that it did not.
We have not previously considered whether the discovery of a valid arrest warrant may serve to dissipate the taint of an unlawful detention. United States v. Williams, 615 F.3d 657, 670 (6th Cir.2010) (“[W]e have never adopted its [the Seventh Circuit’s treatment of a warrant as an intervening circumstance] approach as the law of this circuit.”).[3] The case closest to the issue in our Circuit is United States v. Hudson, 405 F.3d 425 (6th Cir.2005), in which we considered the issue of whether suppression was appropriate where police officers stopped a car without reasonable suspicion because they were in search of an individual with an outstanding arrest warrant and believed him to be a passenger in the car. In Hudson, police officers stopped a car in order to look for Hudson, whom they knew to have an outstanding arrest warrant, even though the officers did not have reasonable suspicion to believe that Hudson would be in the car. 405 F.3d at 429-33. After stopping the car, the police removed all three occupants from the car, patted them down, and placed them in handcuffs. Id. at 429. Only after patting down the occupants of the car and handcuffing them did the police identify Hudson as one of the passengers. Id. During the patdown of Hudson, one of the officers felt an object in Hudson’s pocket, determined that it was cocaine in plastic baggies, and confirmed with Hudson that he had crack cocaine. Id. After we determined that the stop of the car was illegal, we suppressed the drugs found on Hudson because “when the police make an illegal stop for the very purpose of arresting the person stopped, they are thereby exploiting the illegal stop in a manner prohibited by the Fourth Amendment and the evidence obtained in a pat-down of the arrested suspect or in a search incident to the arrest must be suppressed.” Id. at 440.
In our analysis, we considered two cases from the Seventh Circuit, United States v. Green, 111 F.3d 515, 520-23 (7th Cir.1997), and United States v. Johnson, 383 F.3d 538, 546 (7th Cir.2004). Although both Green and Johnson are cases in which the Seventh Circuit held that the discovery of a warrant during an illegal stop constituted an intervening circumstance,[4] in Hudson, we relied on Green only to emphasize *404 that the purpose of an illegal stop or search is determinative of whether the fruits of the search will be suppressed. Hudson, 405 F.3d at 440; Williams, 615 F.3d at 670 (noting that Hudson relied on the Seventh Circuit cases “for the separate proposition that evidence obtained pursuant to an illegal seizure must be suppressed when the police target the defendant.”). Hudson derives its holding that purpose matters from Green’s discussion of the attenuation doctrine factor as to “the purpose and flagrancy of the official misconduct.” Hudson, 405 F.3d at 440; Green, 111 F.3d at 523. Under Hudson, therefore, where the purpose of an illegal stop is to arrest a suspect with an outstanding warrant, the evidentiary fruits of that stop must be suppressed; and, just as it was prior to Hudson in previous cases applying the attenuation doctrine, purpose is a factor in determining whether evidence should be purged of its primary taint. Lopez-Arias, 344 F.3d at 630.
Despite Hudson’s reliance on Green solely for the purpose prong, and our recent and express pronouncement in Williams that we have not adopted the Seventh Circuit cases, the dissent argues that Hudson stands for the proposition that, so long as the purpose of a stop was not to arrest a suspect with an outstanding warrant, the incidental discovery of a warrant during the course of the illegal stop is an intervening circumstances.[5] Although the dissent is in accord with the Seventh Circuit, other circuits have applied the exclusionary rule despite the discovery of an outstanding arrest warrant during the course of an illegal search. In United States v. Lopez, 443 F.3d 1280 (10th Cir. 2006), the Tenth Circuit held that, where there was no reasonable suspicion or probable cause to detain a defendant who was standing next to a legally parked car that had not been reported stolen, the detention of the defendant while an officer ran a warrants check constituted an unlawful seizure that violated the defendant’s Fourth Amendment rights. Id. at 1286. Notwithstanding the officer’s discovery of an outstanding warrant during the check, the Tenth Circuit suppressed the drugs that were found pursuant to the defendant’s arrest because of the unlawful de- ' tention. Id. Similarly, in United States v. Luckett, 484 F.2d 89, 90-91 (9th Cir.1973), the Ninth Circuit held that, where a jaywalker had produced sufficient identification and the officer had already executed a traffic citation, “[b]eeause they [the officers] had no reasonable grounds to be suspicious that there might be a warrant outstanding against [the defendant], this continued detention was unreasonable, and its fruits, therefore, were properly suppressed by the district court.” We agree with the outcomes of these cases that, where there is a stop with no legal purpose, the discovery of a warrant during that stop may be a relevant factor in the intervening circumstance analysis, but it is not by itself dispositive.
To hold otherwise would create a rule that potentially allows for a new form of police investigation, whereby an officer patrolling a high crime area may, without consequence, illegally stop a group of residents where he has a “police hunch” that the residents may: 1) have outstanding warrants; or 2) be engaged in some activity that does not rise to a level of reasonable suspicion. Despite a lack of *405 reasonable suspicion, a well-established constitutional requirement, the officer may then seize those individuals, ask for their identifying information (which the individuals will feel coerced into giving as they will have been seized and will not feel free to leave or end the encounter), run their names through a warrant database, and then proceed to arrest and search those individuals for whom a warrant appears. Under this scenario, an officer need no longer have reasonable suspicion on probable cause, the very crux of our Fourth Amendment jurisprudence. Terry, 392 U.S. at 27-29, 88 S.Ct. 1868; Williams, 615 F.3d at 670, n. 6 (“Allowing information obtained from a suspect about an outstanding warrant to purge the taint of an unconstitutional search or seizure would have deleterious effects. It would encourage officers to seize individuals without reasonable suspicion-not merely engage them in consensual encounters-and ask them about outstanding warrants.”).
Furthermore, holding that the discovery of a warrant after an illegal stop is always a taint-removing intervening circumstance so long as the purpose of the stop is not because the officer believes the suspect has an outstanding warrant would create perverse incentives. We do not wish to create a system of post-hoc rationalization through which the Fourth Amendment’s prohibition against illegal searches and seizures can be nullified. Accordingly, while the discovery of the outstanding arrest warrant in this instance may be a factor in the attenuation analysis, it does not establish attenuation. In this case, Williams had no particularized and objective basis for suspecting Gross of criminal activity at the time of the stop, and no reasonable grounds to suspect that there might be an outstanding warrant arose during the duration of the seizure. Gross answered Williams’s questions, provided identification information, and did nothing to arouse particular suspicions. Nevertheless, Williams continued to detain him in order to run a warrant check. There was no rationale for this action.
The dissent insists that we can find attenuation in this case because the outstanding warrant was discovered after Williams observed that Gross may have been in violation of the open-container law. But the open container itself was a fruit of the illegal stop, and not sufficiently attenuated to constitute an intervening circumstance. In the cases the dissent cites, the defendants responded to the illegal stop with a new and distinct crime that gave officers probable cause to make an arrest. See supra note 3. These cases are inapposite to the present case. Unlike “flight from unlawful detention,” the open container violation was not a “crime completely unrelated to the illegal stop,” as the dissent claims, just like drugs found during an illegal search would not constitute a new crime that could dissipate the taint of the initial illegality. Gross’s detention while Williams ran the warrant check was not rationalized by the citation, but actually a continuation of the illegal seizure. The open container violation is not a “new, distinct crime,” Castillo, 2000 WL 1800481, at *6, and does not establish attenuation in this case.
In sum, the discovery of the outstanding warrant resulted from means that are indistinguishable from the illegal stop, and thus the warrant does not dissipate the taint of the unlawful detention in this case.
Finally, we consider the purpose and fiagrancy of the official misconduct. As to flagrancy, while it is disheartening that Williams had once before blocked in a car in a similar manner, it was not until our recent decision in See, decided after the events in this case, that it would have been *406 clear to Williams that his methods were decidedly an investigatory stop and not a consensual encounter. As to purpose, Williams did not have a lawful purpose for his stop, nor was he, as the officers were in Green, seeking evidence against a third-party. He also did not, as in Williams, “immediately [ask] several questions related to criminal activity other than trespassing.” Williams, 615 F.3d at 670-71. While Williams’s actions could be interpreted to have been “in the hope that something might turn up,” United States v. Shaw, 464 F.3d 615, 630 (6th Cir.2006), unlike in Shaw or Brown, there is not sufficient evidence in the record to show that Officer Williams “knew [he] did not have probable cause.” Id. at 631. Accordingly, the purpose and flagraney of Williams’s actions do not weigh heavily in the attenuation determination.
In weighing the three factors — time, intervening circumstances, and purpose/flagrancy — we cannot conclude that the DNA swab and confession against Gross retain any taint from the initial unlawful seizure. The DNA evidence was obtained several days after arrest and only upon the issuance of a search warrant, and Gross’s confession occurred only after he voluntarily sought to give an incriminating statement to agents two months after arrest and after a second waiver of his Miranda rights. The firearm, however, was found just a short time after Gross entered the jail bullpen, the purpose of Williams’s actions is a wash, and the discovery of the outstanding arrest warrant, in this instance, does not suffice to break the chain of causation.
Based on the foregoing analysis, we conclude the DNA swab and confession evidence obtained against Gross is sufficiently attenuated from the prior unlawful seizure such that any taint has dissipated, but that the possession of the firearm was not sufficiently attenuated and must be suppressed as fruit of the poisonous tree. We therefore affirm the district court’s denial of Gross’s suppression motion as to the DNA swab and confession, but reverse as to the firearm, and remand for further proceedings.
III.
This Court reviews de novo the district court’s legal conclusion that a crime constitutes a “violent felony” under the ACCA. United States v. Hargrove, 416 F.3d 486, 494 (6th Cir.2005) (citing United States v. Martin, 378 F.3d 578, 580 (6th Cir.2004), and United States v. Cooper, 302 F.3d 592, 594 (6th Cir.2002)).
Both Gross and the government urge the Court to remand the case to the district court for consideration of whether Gross’s prior escape conviction is a crime of violence under the ACCA. At sentencing, the district court concluded that Gross was an armed career criminal under 18 U.S.C. § 924(e) based on three prior felony convictions in the Ohio state courts: (1) felonious assault with firearm specification; (2) attempted felonious assault; and (3) escape. In Gross’s plea agreement and at Gross’s plea hearing, however, the parties anticipated that the district court’s ACCA analysis with respect to the escape conviction might be implicated by Chambers v. United States, 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009), which was then pending before the Supreme Court. The parties and the district court therefore agreed that Gross had raised and preserved the issue for appeal in the event that Chambers impacted his eligibility under the ACCA. The district court then sentenced Gross to the statutory minimum 180 months under the ACCA.
The Supreme Court subsequently decided Chambers on January 13, 2009. The Court held that at least one type of escape *407 conviction under Illinois law — “failure to report for penal confinement” — is not a “violent felony” under the ACCA. 129 S.Ct. at 689. Shortly thereafter, this Court decided in United States v. Ford that Chambers abrogated the Circuit’s pri- or view that “all escape offenses — from a failure to report at one end of the spectrum to a breakout at the other — constitute crimes of violence.” 560 F.3d 420, 423 (6th Cir.2009) (citing cases).[6]
In order to determine whether Gross was convicted of a violent felony under Chambers and Ford,, we must now examine the nature of the Ohio escape statute under which Gross was convicted. The Presentence Investigation Report (“PSR”) indicates only that Gross was convicted of a third-degree escape penalty under Ohio Rev.Code Ann. § 2921.34.[7] That statute provides:
No person, knowing the person is under detention or being reckless in that regard, shall purposely break or attempt to break the detention, or purposely fail to return to detention, either following temporary leave granted for a specific purpose or limited period, or at the time required when serving a sentence in intermittent confinement.
Ohio Rev.Code Ann. § 2921.34(A)(1).
“[I]n determining the nature of a defendant’s prior conviction, we apply a ‘categorical’ approach, meaning that we look at the statutory definition of the crime of conviction, not the facts underlying that conviction, to determine the nature of the crime.” Ford, 560 F.3d at 421-22 (quoting Taylor v. United States, 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)). The relevant first inquiry under Chambers and Ford, then, is to determine and distinguish the ways in which the statute characterizes an escape conviction. See Chambers, 129 S.Ct. at 691; Ford, 560 F.3d at 423-24 (concluding that the Kentucky escape statutes, Ky.Rev.Stat. Ann. §§ 520.010.040, characterize an escape conviction in four ways: (1) leaving custody with the use or threat of force; (2) leaving custody in a secured setting; (3) leaving custody in a non-secured setting by “walking away”; and (4) failure to report).
At first glance, it appears that the Ohio statute divides the escape conviction into two distinct categories. First, the statute proscribes a purposeful break or attempt to break from a detention[8] that the defen *408 dant knew or should have known had already commenced. Ohio Rev.Code Ann. § 2921.34(A)(1). Second, the statute proscribes a purposeful failure to return to detention, either following temporary leave or when serving a sentence of intermittent confinement. Ohio Rev.Code Ann. § 2921.34(A)(1). It is not entirely clear that these two distinct categories demarcate the categorical line between violent and non-violent felonies. Although the second category includes precisely the type of “failure to report” violation that the Supreme Court found to be non-violent in Chambers, the first category appears to include all other manners of escape, including escape from arrest, escape from custodial confinement in a variety of circumstances, and escape from a jail-program work detail. This category might include, for example, the type of walkaway escape found not to be a crime of violence in Ford, 560 F.3d at 424-26; see also United States v. Mansur, 375 Fed.Appx. 458, 463 n. 8 (6th Cir.2010). The categorization analysis, therefore, may not be such a straightforward endeavor.
In any event, there is a missing fact that is crucial to guide and limit our analysis: we do not know for what type of escape Gross was convicted. Where “it is possible to violate a criminal law in a way that amounts to a crime of violence and a way that does not,” we may “look at the indictment, guilty plea and similar documents to see if they ‘necessarily’ establish the nature of the prior offense.” Ford, 560 F.3d at 422 (citing Shepard v. United States, 544 U.S. 13, 26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005)). Because the record before us does not contain these documents, we remand to the district court. On remand, the district court should attempt to clarify the nature of the prior escape conviction so that it may be analyzed under the principles discussed in Chambers, Ford, Taylor, and Shepard. The “district court should consider ‘the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or ... some comparable judicial record of this information.’ ” United States v. Anglin, 601 F.3d 523, 529 (6th Cir.2010) (quoting Shepard, 544 U.S. at 26, 125 S.Ct. 1254 (alteration in original)). Because “the government bears the burden of proving that [Gross’s] escape conviction was a crime of violence[,] ... [i]f the government does not meet its burden, the district court may not use [the] escape conviction to resentence him as a career offender.” Id. (citing United States v. Baker, 559 F.3d 443, 455 n. 10 (6th Cir.2009)).
IV.
For the foregoing reasons, we affirm in part and reverse in part the district court’s denial of the motion to suppress, vacate Gross’s sentence, and remand to the district court for further proceedings.

. That Gross was a passenger in the car rather than the driver is of no moment, as a passenger in a seized vehicle is also made to feel that he is not free to leave. See Brendlin v. California, 551 U.S. 249, 255, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) (holding that automobile passengers are seized during traffic stops even though the police command to stop is directed to the driver because a reasonable person in the passenger seat would not feel free to leave once the police have stopped the vehicle); United States v. Jones, 562 F.3d 768, 772-73 (6th Cir.2009); United States v. Campbell, 549 F.3d 364, 371 (6th Cir.2008).

. While time also elapsed between the unlawful stop and the DNA swab — which was taken from Gross on November 20, 2007, five days after Gross was arrested and only upon police obtaining a warrant for the search' — this factor is most appropriate in determining whether a confession has been purged of taint. See Wong Sun, 371 U.S. at 491, 83 S.Ct. 407 (fact that Wong Sun was released and voluntarily returned several days later to make statement dissipated the taint); Brown, 422 U.S. at 603, 95 S.Ct. 2254 (noting that one factor to consider for attenuation is the "temporal proximity of the arrest and the confession’’); United States v. Williams, 615 F.3d 657, 668-70 (6th Cir.2010); United States v. Jackson, 172 F.3d 874, 874 (6th Cir.1998) (discussing time as a factor in determining whether a confession is purged of taint); see also United States v. Najjar, 300 F.3d 466, 478 (4th Cir.2002) (noting that in Brown, the Supreme Court emphasized that the temporal factors aids in a determination of whether the confession was an act of free will, and that "the mere passage of time cannot serve to make tainted physical evidence admissible.”).

. We have held that if a suspect’s response to an illegal stop is a new and distinct crime, such as flight, any evidence recovered incident to the arrest for that crime is not tainted by the unlawfulness of the initial detention. Castillo, 2000 WL 1800481, at *5-6 (high-speed flight from officers constituted an intervening act of purge taint of unlawful detention); United States v. Jefferson, 182 F.3d 919 (Table), 1999 WL 519298, at * 4 (6th Cir. July 15, 1999) (defendant’s flight from scene and use of force against officers constituted intervening circumstance that purged taint). Unlike in Castillo and Jefferson, however, Gross did not engage in any unlawful behavior after Williams illegally seized him. Gross did not respond to Williams's illegal stop with a new and distinct crime, such as flight or violence, that would serve to purge the taint of the unlawful detention.

. In Green, the officers illegally stopped the occupants of a car, for whom they had no reasonable suspicion, in order to gather information about a unrelated third party. In the course of that stop, the officers discovered an outstanding warrant for one of the men. Green, 111 F.3d at 517. The Seventh Circuit held that the discovery of the warrant constituted an intervening circumstance. In Johnson, an officer effectuated an illegal Terry stop on the defendant, but upon reaching the car the defendant was driving, recognized him as someone the officer knew to have an outstanding warrant. Johnson, 383 F.3d at 545. The court cited to Green to support its finding of an intervening circumstance, and went on to hold that after the officer's identification of the defendant, the officer had probable cause to arrest him. Id. at 544-45.

. The use of "incidental” lends itself to an interpretation that Officer Williams discovered the outstanding warrant by happenstance. In fact, the discovery of the warrant was only because of active steps that Officer Williams took. Gross’s arrest was not based on any action initiated by Gross himself, but rather it required the affirmative act by Officer Williams of illegally seizing Gross and running the warrant check.

. In this context, the court treats a "crime of violence” under U.S.S.G. § 4Bl.l(a) the same as a "violent felony” under the ACCA. See Ford, 560 F.3dat421.

. The PSR does not provide a factual description of the prior escape conviction. In any event, a factual description of a prior conviction contained in a PSR may not be used to determine whether that conviction is a crime of violence. United States v. Wynn, 579 F.3d 567, 575-76 (6th Cir.2009).

. "Detention” is broadly defined as:
arrest; confinement in any vehicle subsequent to an arrest; confinement in any public or private facility for custody of persons charged with or convicted of crime in this state or another state or under the laws of the United States or alleged or found to be a delinquent child or unruly child in this state or another state or under the laws of the United States; hospitalization, institutionalization, or confinement in any public or private facility that is ordered pursuant to [state law]; confinement in any vehicle for transportation to or from any facility of any of those natures; detention for extradition or deportation; except as provided in this division, supervision by any employee of any facility of any of those natures that is incidental to hospitalization, institutionalization, or confinement in the facility but that occurs outside the facility; supervision by an employee of the department of rehabilitation and correction of a person on any type of release from a state correctional institution; or confinement in any vehicle, airplane, or place while being returned from outside of this state into this state by a private person or entity pursuant to [state *408 law]. For a person confined in a county jail who participates in a county jail indusUy program ... “detention” includes time spent at an assigned work site and going to and from the work site.
Ohio Rev.Code Ann. § 2921.01(E).