RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0034p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                     *Plaintiff-Appellee,*

    *v.*

MICHAEL DANOTUS YOUNG,
                     *Defendant-Appellant.*

No. 11-2296

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:07-cr-102-1—Paul Lewis Maloney, Chief District Judge.

Argued: October 5, 2012

Decided and Filed: December 20, 2012[*]

Before:  SILER and COOK, Circuit Judges; STEEH, District Judge.[**]

_____

## COUNSEL

**ARGUED:** Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellant.  Mark A. Totten, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:** Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellant. Mark A. Totten, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

---

[*] This decision was originally issued as an "unpublished decision" filed on December 20, 2012. The court has now designated the opinion as one recommended for full-text publication.

[**] The Honorable George C. Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

STEEH, District Judge. Michael Danotus Young pled guilty to being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). He now challenges the district court's denial of his motion to suppress the firearm as the fruit of an illegal seizure.[1] For the following reasons, we affirm.

## I. BACKGROUND

On December 15, 2006, at about 1:15 am, Young was sitting in a reclined position in the passenger seat of a car in a city-owned parking lot outside of Julian's Bar & Restaurant ("Julian's") in Grand Rapids, Michigan. The lot was regularly used for parking by patrons of Julian's, but the area also had a recent history of violent crime, including assaults and shootings. Officers testified that a person who waits outside is more likely to have a gun because Julian's regularly conducts pat-downs of its patrons; they also testified that officers look for people loitering because "that's usually how problems start." Given the city's loitering and trespassing ordinances, it would have been a crime for someone to be in the parking lot without having business at the adjacent establishments. *See* City of Grand Rapids Code of Ordinances § 9.133.

Police Officers Fannon and Johnson described pulling into the parking lot and parking their patrol car behind the car in which Young sat. The officers observed Young for approximately a minute and a half and then approached the car as they were joined by Officer Loeb and began looking through the windows with flashlights. Officer Fannon hit the passenger side window with a flashlight. After a fifteen second pause, Young rolled down the window and Officer Fannon asked Young for identification.

Officer Fannon then asked Young, "You just chillin' out here in the lot or what?" Young responded, "I fell asleep and he ran in." Officer Fannon asked Young where he lived, Young answered, and then Officer Fannon asked, "What brings you here tonight?"

---

[1]Young previously appealed the district court's denial of his motion to suppress evidence. *United States v. Young*, 580 F.3d 373 (6th Cir. 2009), *rehearing and hearing en banc denied* (Oct. 26, 2009). This court affirmed because Young had not properly preserved the issue in the district court. *Id*. at 376. Young returned to district court and filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 on the grounds that his counsel was ineffective for assuring him that his right to appeal would be preserved upon a guilty plea. The district court vacated the original guilty plea and accepted an amended conditional plea that preserved Young's right to appeal the denial of the suppression motion.

Young responded that he was "gonna go get something to eat" with a friend named Eric. As Young explained during the suppression hearing, his friend had gone in to Julian's to inquire about whether they could get a table or take-out. A few seconds later, he identified his friend, Eric, who was approaching the vehicle. Officers told Eric to go back into the restaurant and told Young to "sit tight." Around this time, Officer Fannon passed Young's license to Officer Johnson, who took it back to the police car to run a warrant check.

Shortly thereafter, Officer Fannon told Young that the reason they made contact is because he was not allowed to sit in a vehicle in this city-owned lot, that " you gotta do business at the store, whatever, you gotta go in, can't, can't be out here sitting," and "we're just going to sit tight for a second and we'll get you on your way." Officer Fannon then asked about past arrests, and Young told him about a 1994 drug-related arrest.

Officer Fannon testified that around this time he noticed that Young moved his left hand a few times, briefly touching the area near his pocket and that this made him suspicious that Young might have a weapon or contraband. He told Young to keep his hands where he could see them and asked whether he had any weapons; Young responded "no." Officer Fannon testified that the gestures continued, so he reached for his weapon. He then asked Young to step out of the car.

Once Young was out of the car, Officer Fannon told him to turn around. Young then disclosed that he had a gun in his pocket. The officers immobilized Young, searched his person, retrieved the gun, and placed him in handcuffs. Around this time, Officer Johnson returned with Young's license and notified the others that Young had an outstanding arrest warrant. The entire incident lasted less than four minutes.

Young was charged with being a felon in possession of a firearm. He filed a motion to suppress the gun on Fourth Amendment grounds, arguing that the officers had no reasonable basis to approach a legally parked car in a public parking lot and that Mr. Young did nothing during the encounter to suggest he had done anything illegal. The district court denied the motion, reasoning that there was no seizure—and thus Fourth

Amendment considerations did not apply—until Young was ordered out of the car, by which time the officers had the justification of "furtive gestures." Even if Young was seized earlier, the court found that the parking lot's recent history of shootings, the fact that Julian's conducts pat-downs of patrons, a possible trespassing violation, and the fact that Young was "dozing" gave the officers the authority to at least approach the vehicle and request identification to check for warrants. The court held that officers had authority to detain Young while checking for warrants and to arrest him for the outstanding warrant, and that this would have led to discovery of the gun absent anything else that occurred. Young pled guilty and was sentenced to 180 months in prison.

## II. ANALYSIS

An appeal of a district court's denial of a motion to suppress presents a mixed question of fact and law. *United Stated v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010). We consider the evidence in the light most favorable to the party that prevailed at the district court and review factual findings for clear error. *Id.*; *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Smith*, 594 F.3d at 535 (internal quotation marks omitted). The ultimate finding of reasonable suspicion, however, is a legal conclusion that we review *de novo. See United States v. Gross*, 662 F.3d 393, 398 (6th Cir. 2011); *United States v. See*, 574 F.3d 309, 311 (6th Cir. 2009).

Young first argues that he was seized when the officers parked behind him or, at least, when the officers told him to "sit tight." He further argues that the officers had no reasonable suspicion to seize him because he was engaged in lawful activity and because suspicion of "mere trespassing" is not sufficient to support a seizure. Finally, he argues that even if the officers had reasonable suspicion of trespass initially, the seizure exceeded permissible scope once Young explained his purpose for being in the parking lot.

**A. Seizure**

Fourth Amendment considerations governing unreasonable seizures are not triggered unless and until a person in question is actually "seized." *See* U.S. Const. amend. IV*; Terry v. Ohio*, 392 U.S. 1, 16 (1968). "Seizure" extends to any circumstance in which a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 20 n.16. Minor seizures, sometimes referred to as "*Terry* stops," occur when, in light of all the circumstances, "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

This court has issued two opinions—both since the district court's denial of Young's motion to suppress—that address the question of whether a person was seized in circumstances similar to the present facts. In *United States v. See*, 574 F.3d 309, 311 (6th Cir. 2009), an officer parked a police cruiser in front of a parked car in which the defendant and two companions sat so that the defendant could not drive away. We held that under such circumstances, a reasonable person would not have felt free to leave and that the incident was a *Terry* stop. *Id*. at 313. In *United States v. Gross*, 662 F.3d 393, 396 (6th Cir. 2011), a police cruiser parked directly behind a legally parked car in which the defendant sat slumped down in the passenger seat, and the police officer approached the passenger-side window on foot. The officer's actions were markedly similar to the officer's actions in *See*, and we held that the incident was also a *Terry* stop. *Id*. at 400.[2]

While the record is unclear as to whether the police cruiser in the present case actually blocked the parked car, we assume that it did because the Video shows another car directly in front of the parked car. In this case, Young's position and activity was identical to that of the defendant in *Gross*. The presence of three officers shining flashlights into the car and authoritative instructions from Officer Fannon also suggest that a reasonable person would not have felt free to leave anytime thereafter. *See*

---

[2]*Gross* and *See* arguably created new rules, but they nonetheless apply to Young because new rules of constitutional law apply to criminal cases pending on direct review. *See Teague v. Lane*, 489 U.S. 288, 304 (1989). While the district court denial of Young's motion occurred in 2007, the present appeal is on direct review.

*Mendenhall*, 446 U.S. at 554 (listing "the threatening presence of several officers, . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" as indications of a seizure).  Thus, we find that Young was subject to a *Terry* stop at the time the police cruiser parked behind the car in which he sat.

**B. Reasonable Suspicion**

In a *Terry* stop, officers may briefly detain a person for investigative purposes so long as it is "reasonable."  *Terry*, 392 U.S. at 20-22.  This is an exception to the general rule that seizures are per se unreasonable when conducted without a warrant. *Id.*; *see also Katz v. United States*, 389 U.S. 347, 357 (1967).  We determine whether a *Terry* stop is reasonable under the Fourth Amendment by using a two-part analysis. *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005).  We first ask whether there was reasonable suspicion to initiate the stop, and we next ask whether the stop was reasonable in scope.  *Id.*

### a. The officers had reasonable suspicion to initiate a *Terry* stop

To test an officer's right to initiate a *Terry* stop, we ask "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion" of criminal activity.  *Davis*, 430 F.3d at 354 (internal quotation marks omitted).  To this end, we look to the totality of the circumstances when the *Terry* stop commenced.  *Id.*  The officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006) (internal quotation marks and citations omitted).  Ambiguous behavior does not give rise to reasonable suspicion because "reasonable suspicion looks for the exact opposite of ambiguity."  *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011).

The only pertinent inquiry is the factual basis for the officer's suspicion of trespass at the time the police cruiser parked behind Young.  At this time, the police

officers had only three justifications: the recent high-crime history of this lot, pat-downs of Julian's patrons, and Young's reclined position in the passenger seat of a parked car.

The high-crime history of the parking lot and the fact that Julian's conducts pat-downs are contextual factors, not specific to Young. We have warned that contextual factors, such as high-crime, should not be given too much weight because they raise concerns of racial, ethnic, and socioeconomic profiling. *Caruthers*, 458 F.3d at 467. At minimum, an individual being in a high-crime area does not alone give rise to reasonable suspicion. *Id.* But this does not mean contextual factors are not relevant to our totality of the circumstances analysis. In *Caruthers*, for example, we considered the high-crime context because the specific criminal history of the intersection was the same crime for which the citizen was stopped. *Id.* at 468. In Young's case, the high-crime factor is somewhat muddled because Young was stopped on suspicion of trespassing, but the specific crime history in the lot was violent crime. However, according to the testimony of the officers, the trespassing and gun crimes are inter-related. Because Julian's conducts pat-downs, a person in possession of a gun is more likely to remain outside in the parking lot. Further, and contrary to Young's argument, this case is not like *See* and *Gross* where the high-crime area did not provide reasonable suspicion to suspect the citizens of criminal activity merely because they were loitering, because the *crime* of loitering was not at issue those cases. *See*, 574 F.3d at 311-12, 314; *Gross*, 662 F.3d at 396-97, 400. Here, trespassing *itself* was a crime. Thus, we consider these contextual factors, giving them an appropriately small amount of weight because they are not particularized to Young.

Young's reclined position in the passenger seat of a parked car outside of an open restaurant at 1:15 am was a fact particularized and specific to him, and thus, is entitled to more weight. The officers also watched Young for a minute and a half, and observed that he appeared to be going nowhere. At this time, they did not have Young's explanation that he was waiting for a friend to see if they could be served. While it is possible to view these circumstances as ambiguous, it looked like Young had no

business at Julian's from the officers' perspective, and, thus, it looked like he was trespassing.

Considering the three factors together in the totality of the circumstances, they were sufficient and reasonably support a brief *Terry* stop to investigate initial suspicions of trespassing. As the Supreme Court has noted, while the officers must be able to articulate something more specific and particularized than a "hunch," the amount of proof required to support reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Young raises a novel argument that suspicion of a mere trespassing violation is not sufficient to support a *Terry* stop under a "reasonableness" inquiry because such offenses do not pose a danger to the public. Relying on *United States v. Place*, 462 U.S. 696, 703 (1983), and *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975), Young argues that Fourth Amendment reasonableness is determined by balancing the public interest that justifies intrusion against the individual's right to be free from arbitrary interference. *See also* Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.2 (4th ed. 2004, Supp. 2011) (suggesting that *Terry* stops can never be used for minor offenses that do not pose a danger to the public). However, Young's use of the balancing test is misplaced because the Supreme Court uses it to carve out exceptions to the warrant requirement, not to define what is "reasonable" within the *Terry* stop exception. *See Place*, 463 U.S. at 704 (listing three categories of warrant requirement exceptions that are justified by the government interest at stake)*; Brignoni-Ponce*, 422 U.S. at 877-79 (using the balancing test to carve out an administrative exception for stopping cars on the border to check citizenship status).

Even if we applied a balancing test here, the public interest in increasing safety in high-crime areas justifies brief, relatively unintrusive contact by police officers. Such interaction, when conducted in a professional, non-threatening manner, fulfills the officers' duty to protect and serve. *Terry* itself only requires reasonable suspicion that some "criminal activity may be afoot." *Terry*, 392 U.S. at 30. As we have previously

suggested, suspicion of trespassing is alone sufficient to support a *Terry* stop. *United States v. Thomas*, 77 F. App'x 862, 865 (6th Cir. 2003) (noting that even if the circumstance in question was a *Terry* stop, it would have been justified because the officer had a reasonable suspicion of trespass); *United States v. Simmons*, 174 F. App'x 913, 915-17 (6th Cir. 2006) (finding that there was reasonable suspicion of a trespassing violation, thus supporting a *Terry* stop).

Accordingly, the district court did not err in finding that the officers had reasonable suspicion to initiate a *Terry* stop.

### b. The warrant check and initial questioning were within the permissible scope of the *Terry* stop.

We now ask whether the scope of the *Terry* stop was reasonable. To test the scope, we must determine whether the stop was reasonable both in time and investigative techniques, given the officers' suspicions and surrounding circumstances. *Davis*, 430 F.3d at 354. The means of investigation must have been likely to confirm or dispel the officers' suspicions quickly. *Id.* A *Terry* stop should be limited in time and the techniques used should be "the least intrusive means reasonably available." *Caruthers*, 458 F.3d at 468.

Officer Fannon first asked Young for his identification and gave Young's license to Officer Johnson to run a warrant check. He then asked Young about his purpose for being in the lot. (*E.g.* "You just chillin' out here in the lot or what?") This appears designed to determine whether Young was loitering or trespassing. The parties disagree about whether the police were obligated to give credit to Young's explanation that his friend ran in to see if they could get food, and about whether the "furtive gesture" was sufficient to give rise to suspicion of an additional crime. However, it is not necessary to reach these questions because Officer Johnson had already begun the warrant check before either of these events occurred. Regardless of the other events during the stop, the warrant check would have produced the outstanding warrant, the officers could have arrested Young, and the gun would have been discovered. The relevant question, then,

is whether the officers had a right to run a warrant check unrelated to the suspected crime before ascertaining whether Young was trespassing.

The Sixth Circuit has not yet answered this question. On the one hand, running a warrant check is not the quickest way to "confirm or dispel suspicion" of trespass, nor is it the "least intrusive means" of investigation. *See Caruthers*, 458 F.3d at 468; *Davis*, 430 F.3d at 354. We have stated before that we do "not wish to create a system of post-hoc rationalization through which the Fourth Amendment's prohibition against illegal searches and seizures can be nullified" by outstanding warrants. *Gross*, 662 F.3d at 405. On the other hand, the Supreme Court has noted that "questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops . . . . Knowledge of identity may inform an officer that a suspect is wanted for another offense." *Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 186 (2004); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop . . . in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.").

While Supreme Court precedent does not say that "obtaining more information" is always appropriate, some of our sister circuits have expressly held that officers do not exceed the permissible scope of a *Terry* stop by running a warrant check, even when the warrant check is unrelated to the crime suspected. *Klaucke v. Daly*, 595 F.3d 20, 26 (1st Cir. 2010) (citing *United States v. Kirksey*, 485 F.3d 955, 957 (7th Cir. 2007)); *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008). This procedure may help clear a person's name or may give the officers important information about the suspect. *United States v. Villagrana-Flores*, 467 F.3d 1269, 1275 (10th Cir. 2006). We find this persuasive and, accordingly, hold that the officers here did not exceed the reasonable scope of a *Terry* stop by running a warrant check.

Because the officers were reasonable in conducting a warrant check, the inevitable product of that check, the gun, is the fruit of a legal seizure. While it is possible to argue that it was excessive for three officers with flashlights to surround the car of a sleeping individual, the discovery of the gun arose from other actions that we

find were reasonable. The *Terry* stop lasted only four minutes, no longer than it took Officer Johnson to conduct the warrant check. The officers were reasonable in maintaining the status quo by telling Young to "sit tight" while they completed the check. The district court did not err in finding the *Terry* stop reasonable in scope.

The exclusionary rule prohibits using the fruits of an unlawful search or seizure as tangible evidence in a criminal case. *See New York v. Harris*, 495 U.S. 14, 19 (1990)*; Murray v. United States*, 487 U.S. 533, 536 (1988); *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963). It is used to deter unlawful government behavior. *Gross*, 662 F.3d at 401. However, the use of the rule assumes an underlying illegal search or seizure. *See id*. at 402. There is no illegal seizure here. Even if later police actions, such as questioning about past crimes and weapons or ordering Young out of the car, were not reasonable, the evidence would have been discovered inevitably through lawful means. *See Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) (holding that it is permissible for an officer to retrieve evidence as incident to lawful arrest). Exclusion of the gun is not warranted.

## III.  CONCLUSION

We do not attempt to minimize the dangers of oppressive police practices or *Terry* stop abuses. *See, e.g.*, David A. Harris, *Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked*, 69 Ind. L.J. 659, 660 (1994). Surely, a citizen should not be harassed by police while engaging in lawful activity, even if the lawful activity occurs at night and in a high-crime area. However, police officers must be able to investigate *actual crimes*, including "mere" trespassing violations. When a lawful stop occurs, identification and warrant checks are basic police practices. For this and the above reasons, we affirm the district court's denial of Young's motion to suppress.