Stewart, J., dissenting.
{¶ 51} In this appeal, we are asked to decide a single narrow issue: whether a person's presence near a location police thought gunshots had recently been fired from amounts to particularized suspicion sufficient to conduct an investigatory stop, see Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In answering this question, we must either conclude that appellee Jaonte Hairston's Fourth Amendment rights were violated by the stop or adopt a gunfire exception to the Fourth Amendment's requirement that police have an objective basis for suspecting a particular person of criminal activity before stopping that person. The majority opinion does the latter and thereby erodes the Fourth Amendment's particularity requirement.
{¶ 52} Police officers stopped Hairston while he was walking across a street in an area they guessed gunshots had been fired from less than a minute earlier. The majority's holding-that these facts give rise to reasonable suspicion that Hairston had fired the shots or was involved in some criminal activity related to the shots such that stopping and detaining him was lawful-cannot plausibly be squared with decades of United States Supreme Court precedent explaining the particularity requirement.
{¶ 53} The core issue in this case is not whether the police had reason to believe that someone, somewhere had committed a crime but, rather, whether they had particularized suspicion of Hairston as the perpetrator sufficient to stop him and do a pat-down for weapons. Despite the obvious relevance of the particularity requirement to this case, the majority not only fails to cite any decision explaining that requirement but actually criticizes the court of appeals for focusing on it.
{¶ 54} When the United States Supreme Court issued its decision in Terry over 50 years ago, thereby creating an exception to the requirement that police have probable cause to believe that a suspect has committed a crime before seizing him, it was sensitive to the fact that the decision would place certain limits *378 on an individual's Fourth Amendment right to be free from government intrusion to give police the necessary ability to respond to perceived threats to public safety in real time. 392 U.S. at 20-23, 88 S.Ct. 1868, 20 L.Ed.2d 889. The reasonable-suspicion standard announced in Terry was meant to balance these two important but often competing interests. Id. at 27, 88 S.Ct. 1868. The Supreme Court has since remained confident in this standard by virtue of its " 'narrow scope,' " which the court " 'has been careful to maintain.' " *1146 Ybarra v. Illinois , 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), quoting Dunaway v. New York , 442 U.S. 200, 210, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The hallmark of Terry 's narrow scope is that it requires particularized suspicion. See United States v. Cortez , 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).
{¶ 55} Police are required to have had particularized, not generalized, suspicion before a brief investigatory stop may be deemed lawful. Id. at 418, 101 S.Ct. 690. Practically speaking, this means that an officer conducting such a stop "must be able to point to specific and articulable facts which, taken together with rational inferences," Terry at 21, 88 S.Ct. 1868, show "a particularized and objective basis for suspecting the particular person stopped of criminal activity," Cortez at 417-418, 101 S.Ct. 690.
{¶ 56} Before determining whether the government has met its burden of showing particularized suspicion, a reviewing court must examine the surrounding circumstances in their totality, including objective observations and any reasonable deductions or inferences that an officer might draw from them, and examine whether "the process just described * * * raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing." (Emphasis added.) Id. at 418, 101 S.Ct. 690. As the Supreme Court noted in Terry , and again 13 years later in Cortez , " 'this demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence .' " (Emphasis added in Cortez .) Id. , quoting Terry at 21, fn. 18, 88 S.Ct. 1868. In other words, police must have distinct, articulable facts specific to the suspect in question at the time of the stop that rise to the level of reasonable suspicion or else the stop is unlawful under the Fourth Amendment.
I. The trial court improperly applied a subjective reasonable-suspicion standard
{¶ 57} At the suppression hearing in this case, Officer Samuel Moore testified to the following specific facts: that he heard gunshots that sounded like they were close and coming from the west, by his "guesstimate" from near an elementary school; that he and his partner drove approximately a half mile, in approximately 60 seconds, to an intersection near the southeast edge of the school's campus; and *379 that having arrived there by the shortest route, they encountered Hairston walking through a crosswalk talking on his cell phone, whereupon they immediately ordered him, with guns drawn, to stop. Officer Moore also identified several surrounding circumstances-namely that it was nighttime, that he knew that the area around the school was a "high crime" area, and that it was also a residential area with a lot of houses. On direct examination, when asked whether he had seen anyone else near the school when the stop occurred, Officer Moore testified that he could not recall, nor could he recall whether he had seen any other vehicles driving by. The significance of these latter facts cannot be overstated, as more fully discussed below.
{¶ 58} Based on this limited testimony, the trial court, applying an incorrect, subjective standard, denied Hairston's motion to suppress. Specifically, the trial court stated: "So I think it's a close call because, you know, what's a reasonable suspicion probably varies from one individual to the next . But with all the facts that were testified to by the officer, I think they had enough to do a Terry stop. So I'll deny the motion." (Emphasis added.)
{¶ 59} Literally the first principle of applying the reasonable-suspicion standard is that it does not vary from one individual *1147 to the next. The standard is an objective one, not a subjective one. See Terry , 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 ("it is imperative that the facts be judged against an objective standard"). Neither the majority opinion nor the concurring opinion discusses the trial court's application of a subjective standard, obvious though it is. Nor do they bother to consider how the trial court's standard would necessarily impact a reviewing court's analysis. Indeed, both opinions sweep the error aside by incorrectly declaring that the trial court applied the standard established in Terry . That is not what happened. Although the trial court mentioned the Terry standard, no reviewing court could look at the trial court's remarks and reasonably conclude that it correctly applied the Terry standard.
{¶ 60} Importantly, the trial court's application of the wrong standard also impacts appellate consideration of its factual findings, including any conclusions and inferences drawn from them. "Appellate review of a motion to suppress presents a mixed question of law and fact." State v. Burnside , 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. What this means is that a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence," id. , citing State v. Fanning , 1 Ohio St.3d 19, 437 N.E.2d 583 (1982) ; then, "[a]ccepting these facts as true, the appellate court must * * * independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard"-in other words, it must review the legal conclusion de novo. Id. It is indisputable that the trial court made only a few factual findings in this case, the entirety of which are as follows:
*380 [I]n this case the officers personally heard the shots, personally knew where they came from * * *.
[T]hey personally heard them and went in that direction, and the officer said it only took them a minute or so to get there. And you asked him if he had a hunch, and he said yeah. Well, he did have a hunch, but that doesn't necessarily mean that he didn't have a little more than a hunch when he only saw one person in the area and didn't see any other cars.
{¶ 61} Upon review of these findings, it is unclear whether the trial court reached them by improperly deferring to Officer Moore's view of the situation-as it appears-or by properly using its own independent judgment about what a reasonably prudent officer encountering the same situation would think and do.[4] Indeed, given the lack of competent and credible evidence supporting these findings, it seems more likely that the trial court improperly deferred to Officer Moore's personal belief *1148 that he not only had arrived at "where" the shots "came from" but once encountering Hairston there, had particularized suspicion sufficient to stop him. For the trial court to admit that its decision was a "close call" even while deferring to the subjective suspicions of Officer Moore, rather than considering the objective observations of a reasonably prudent police officer, casts serious doubt on whether the court would have reached the same conclusion if it had applied the correct standard. The majority and concurring opinions' deference to the trial court's factual findings is therefore baffling. At the very least, what this court should do is look at these determinations with a critical eye and explain why they are supported by competent and credible evidence, before determining whether they support a finding of particularized suspicion. Noticeably, both opinions skip this step.[5] *381 II. The police lacked a reasonable basis for particularized suspicion of Hairston
{¶ 62} When taken together, the facts and circumstances identified by the police in this case, and any reasonable inferences that can be drawn from them, are too attenuated to support particularized suspicion that Hairston fired the shots or was involved in any way with the gunfire. At a minimum, what is missing is some fact or reasonable factual inference that would connect Hairston to a potential crime.
{¶ 63} The closest thing we have in this regard, although it still hits wide of the mark, is Hairston's walking across a street in the area the officer guessed the gunfire might have originated. But neither the trial court's finding that Hairston was the sole person in the area nor the officer's guess as to the origin of the gunfire is supported by competent and credible evidence.
{¶ 64} First of all, Officer Moore's testimony was that he did not recall seeing any other people or vehicles nearby, and the police report never mentions that Hairston was the only person in the area. This is an important distinction that the majority and concurring opinions also do not discuss. If a finding of particularized suspicion depends on the fact that the person stopped was the only person in the vicinity of suspected criminal activity, then it is of utmost importance that the person actually was the only one there. Officer Moore's inability to recall whether Hairston was the only person seen in the area greatly erodes a reasonable basis for particularized suspicion in this case. Indeed, if this alleged fact did form the basis for the officer's suspicion of Hairston, then the officer should have had no problem recalling whether he had seen anyone else around. The officer's uncertainty on this point significantly undermines the trial court's finding that Hairston was the only one in the vicinity-as does the fact that the area surrounding the school's campus and where Hairston was stopped was also a densely populated neighborhood, a fact that the chief justice's dissent examines in detail.
*1149 {¶ 65} Further, nothing about the officer's testimony suggests that his guess as to the location of the gunfire was a particularly good one or indeed was based on anything more than conjecture. For a reviewing court to find particularized suspicion based solely on the location of a stop, the officer's guess must be supported by some objective indicia of reliability. As the United States Supreme Court has explained:
*382 Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors-quantity and quality-are considered in the "totality of the circumstances-the whole picture" that must be taken into account when evaluating whether there is reasonable suspicion.
Alabama v. White , 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), quoting Cortez , 449 U.S. at 417, 101 S.Ct. 690, 66 L.Ed.2d 621.
{¶ 66} Generally, in a Fourth Amendment case, the prosecution would show that what would otherwise appear to be mere speculation by a police officer was actually a reasonable inference by eliciting from the officer testimony describing how his training or specialized experience led him to draw the inference. See United States v. Padilla , 548 F.3d 179, 187 (2d Cir.2008), quoting United States v. Arvizu , 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("While the officer may not rely on an 'inchoate and unparticularized suspicion or "hunch," ' [ Terry ] at 27, 88 S.Ct. 1868 [20 L.Ed.2d 889], he is entitled to 'draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person' " [brackets sic] ). But Officer Moore did not do so in his testimony.
{¶ 67} During his testimony, Officer Moore offered no insights into how his training or experience aided him in determining the origin of a sound from a distance of nearly a half mile away, nor did he explain why Hairston-who was merely walking across the street and talking on his cell phone near the assumed location-should have been seen as particularly suspicious. Similarly, Officer Moore offered no explanation as to why his search for suspects zeroed in on the precise location where Hairston was stopped (which happened to be only one small corner of the elementary school's otherwise large campus) instead of extending to the whole area surrounding the school, including its numerous playing fields and outbuildings.[6]
{¶ 68} It was the lack of factual specificity, in terms of both quantity and quality, connecting Hairston to any suspected criminal activity that ultimately resulted in reversal by the court of appeals. The majority and concurring opinions *383 fail to provide any reasons why the appellate court might have been incorrect in concluding that the prosecution failed to satisfy *1150 the particularity requirement, and they blindly defer to the trial court's unsupported factual findings.
III. The court of appeals properly examined the totality of the circumstances
{¶ 69} Rather than consider whether the police had the particularized reasonable suspicion required to conduct a Terry stop, the majority opinion focuses on facts and circumstances that are irrelevant to that determination. Specifically, the majority opinion claims that the appellate court "went astray by focusing on individual factors in isolation rather than on the totality of the circumstances," "refusing to give any weight to the contextual factors asserted by the state" and placing undue weight on the fact that Hairston did not flee when the officers approached. Majority opinion at ¶ 15. As convenient as these characterizations may be for arriving at the majority's end result, they are not accurate. Even if they were, that would not matter.
{¶ 70} Nothing about the appellate court's decision suggests that it looked at individual factors in isolation. Not only did the court explain that its task was to examine the totality of the circumstances from the objective viewpoint of a reasonable police officer, but it also explained that the Fourth Amendment requires " 'a particularized and objective basis for suspecting the particular person stopped of criminal activity,' " 2017-Ohio-7612, 97 N.E.3d 784, ¶ 10, quoting Cortez , 449 U.S. at 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621. Analyzing the circumstances objectively, the appellate court accepted the facts that the officers heard gunshots, that they sounded as if they had come from the west, that the officers came upon Hairston after traveling in that general direction, that it was nighttime in a "high crime" area, and that Hairston appeared nervous once the police stopped him with their guns drawn . But when looking at these facts as a whole, the appellate court correctly determined that a crucial piece was missing. That crucial piece, a central requirement under the Fourth Amendment, is some indication giving rise to a reasonable suspicion "that the particular individual being stopped," Cortez at 418, 101 S.Ct. 690 -Hairston-"[had] engaged" in particular "wrongdoing," id. -firing a gun.
{¶ 71} In the absence of any objective, articulable facts reasonably linking Hairston in particular to the gunshots, contextual factors such as the time of day and the area's reputation are of scant analytical value. See, e.g. , Brown v. Texas , 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ; United States v. Young , 707 F.3d 598, 603 (6th Cir.2012) ; Bennett v. Eastpointe , 410 F.3d 810, 830 (6th Cir.2005). The concurring opinion understands this, noting that the appellate court was "correct that the contextual factors of a nighttime stop and a high-crime area were legally irrelevant in Hairston's case." Concurring opinion at ¶ 26.
*384 Contrary to the majority's apparent belief, this context by itself does not give rise to the particularized suspicion required for police to stop any individual who happens to be present in that context. Rather, all context alone can do is lend support to an officer's inferences that a person's conduct, which might otherwise be wholly innocuous in another context, is reasonably suspicious in the present context.
{¶ 72} Suppose, for example, that an officer observes a person handing a paper bag through a car window to another. In the nighttime, in a neighborhood with a high crime rate, passed between people moving skittishly, it might be reasonable to suspect that the bag contains contraband. Outside a playground on a sunny *1151 morning, handed by an adult to a child, the bag is probably lunch. What we are missing in this case are the handoff and the bag-in other words, the particularized suspicion.
{¶ 73} The majority chides the appellate court for focusing part of its analysis on the fact that Hairston did not flee when approached by the police. Specifically, the majority states that "the court placed undue reliance on [this] fact," majority opinion at ¶ 15, and then, as if to support its statement, cites the inapposite case of State v. Williams , in which we upheld a police officer's decision to stop and frisk a suspect, despite the suspect's lack of flight, when the officer was able to articulate a number of other suspicious behaviors linking the suspect to a nearby illegal marijuana operation. 51 Ohio St.3d 58, 61-62, 554 N.E.2d 108 (1990). What the majority fails to realize is that it is exploiting the same type of divide-and-conquer method that it unfairly accuses the appellate court of misusing. The fact that Hairston did not flee when approached by the officers is part of the totality of the circumstances. The appellate court therefore correctly considered it.
{¶ 74} For the majority to say that the appellate court gave the fact that Hairston did not flee "undue reliance" ignores the reason for discussing it at all-namely, to highlight the paucity of facts and reasonable inferences that could have led a reasonably prudent police officer to suspect Hairston of wrongdoing, or indeed of any doing. Having found nothing that would reasonably connect Hairston to the gunfire, the appellate court discussed what might have contributed to reasonable suspicion if certain facts had existed-in this case, flight. It is not illogical that the court would discuss this; there are times when there is so little connecting a person to a crime that police point broadly to a suspect's attempt to elude them. See Illinois v. Wardlow , 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"); United States v. Lawshea , 461 F.3d 857, 860 (7th Cir.2006) ("while mere presence in a high-crime area does not in and of itself *385 justify an investigatory stop, suspicious flight, no matter the area, does"). The appellate court properly noted that there was no suspicious flight in this case.
{¶ 75} Although it is not totally clear-because again, the majority does not deign to acknowledge the particularity requirement-it seems that the majority is trying to concoct particularized suspicion out of the fact that Hairston happened to be in an area the police believed gunshots were fired from approximately one minute earlier. But as explained above, the officer's speculation about the gunshots' origin is accompanied by no indicia of reliability. Without at least some such indicia, nothing about these facts, contextual or otherwise, allows a court to infer that a reasonably prudent police officer would have found Hairston's presence in that area suspicious in and of itself. Indeed, if any doubt remains as to the reliability of the officers' observations that led to the stop, the majority need look no further than Officer Moore's sworn testimony at the suppression hearing stating that he "guesstimate[d]" the location of gunfire and that he proceeded to stop Hairston based on a "hunch."
{¶ 76} Although the majority correctly observes that the Fourth Amendment's reasonable-suspicion requirement does not deal in certainties, it forgets that the requirement also does not deal in unsupported guesses and hunches. See Terry , 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (reasonable suspicion requires more than an "inchoate and unparticularized suspicion *1152 or 'hunch' "). And yet today, the majority announces that in the seventh most populous state in the nation, a guess and a hunch are sufficient for a Terry stop.
{¶ 77} By Officer Moore's own account, Hairston was not doing anything suspicious when the officers spotted him. He was walking calmly through a crosswalk while talking on his cell phone. It was not until Officer Moore and his partner exited their vehicle with guns drawn and ordered Hairston to stop that Hairston gave any indication that he might be nervous. Even so, Officer Moore acknowledged on cross-examination that it is not unreasonable for a person to become nervous with guns pointed at him. But regardless of the reason for it, the fact that Hairston appeared nervous does not much matter since the nervousness was observed only after he was ordered to stop. Anything that happened thereafter is immaterial. The fact that the state relies on Hairston's apparent nervousness after he was ordered to stop to support its position that the police had particularized suspicion before the stop -and the fact that the majority mentions it twice in its opinion-highlights just how precarious the factual justification for the stop was in this case. When the police stopped Hairston, all they knew or could reasonably infer was that Hairston was walking through a "high crime" area in which gunshots may have been recently fired. But "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is *386 committing a crime." Wardlow , 528 U.S. at 124, 120 S.Ct. 673, 145 L.Ed.2d 570, citing Brown v. Texas , 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).
IV. There is no "gunfire" or "firearm" exception to the particularity requirement
{¶ 78} The state in this case dedicated a large portion of its briefing to what essentially boils down to an argument advocating for a "gunfire exception" to the particularity requirement of the Fourth Amendment. In response to Hairston's arguments that police could not reasonably have had particularized suspicion based solely on his location and that they could have continued to surveil him for suspicious activity rather than descend upon him with guns drawn and order him to stop, the state argues that the police must be able to respond "differently" when reacting to gunfire. Specifically, the state contends that "an officer who is responding to recent gunfire must have complete command of the scene. A responding officer must be able to protect himself or herself and others by having his or her gun drawn and ready, and the officer must be able [to] acquire information from individuals at the scene ." (Emphasis added.)
{¶ 79} The state cites decisions-namely, State v. Johnson , 8th Dist. Cuyahoga Nos. 71249 and 71250, 1997 WL 661882 (Oct. 23, 1997), and United States v. Roberson , 90 F.3d 75, 81 (3d Cir.1996), fn. 4-suggesting that police officers should not have to ensure they are acting on reliable information when stopping a person based on a tip that the person is carrying a weapon. Lost on the state, however, is that the United States Supreme Court has already declined to adopt under the Fourth Amendment a "firearm exception" applicable to when the suspected criminal activity involves an illegal gun, making clear that in such cases, police remain subject to the requirement that the information upon which they act must bear standard indicia of reliability before they may conduct a Terry stop. See Florida v. J.L. , 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Writing for a unanimous court, Justice Ginsburg explained:
*1153 A second major argument advanced by Florida and the United States as amicus is, in essence, that the standard Terry analysis should be modified to license a "firearm exception." Under such an exception, a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing. We decline to adopt this position.
Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; Terry 's rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this *387 very concern. See 392 U.S. at 30, 88 S.Ct. 1868 [20 L.Ed.2d 889]. But an automatic firearm exception to our established reliability analysis would rove too far.
Id. at 272, 120 S.Ct. 1375.
{¶ 80} Simply put, there is no special exception to the Fourth Amendment's particularity requirement for gun cases. See id. ; see also Chandler v. Miller , 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) ("the Fourth Amendment's "restraint on government conduct generally bars officials from undertaking a search or seizure absent individualized suspicion"). And yet the fact that the majority effortlessly reverses the appellate court's unanimous decision with an incomplete outline of Fourth Amendment law and a brief analysis of the facts tends to show that the majority's holding does not derive from a genuine application of Fourth Amendment law but, rather, from a position that mirrors the state's-that police officers should be allowed to stop anyone when investigating suspected gunfire. Indeed, the majority's statement that "it was reasonable and prudent for the officers to stop Hairston to see if he was the source of or had information about the gunshots," majority opinion at ¶ 18, is not so far off from the state's position that officers responding to gunfire "must be able [to] acquire information from individuals at the scene" (emphasis added). Both statements show a predisposition to believe that there is, or should be, a gunfire or firearm exception to the Fourth Amendment's particularity requirement. But there is not. Indeed, neither the state nor the majority have pointed to a single case in which a court has found it reasonable and prudent for a police officer to conduct a nonconsensual stop of a person just to see whether he has information about a crime involving gunfire.[7] Rather, in such circumstances, a brief investigatory stop of a person is reasonable under the Fourth Amendment only if the police reasonably suspect that the particular person either has committed the crime or is about to commit the crime.
{¶ 81} Such particularized suspicion is wholly absent in this case. I therefore dissent and would conclude that the court of appeals correctly determined that *388 Hairston's *1154 Fourth Amendment rights were violated and that the fruits of that constitutional violation should be suppressed.
O'Connor, C.J., concurs in the foregoing opinion.

As noted by the Supreme Court in Terry :
The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?
(Footnote omitted.) Id. at 21-22, 88 S.Ct. 1868, quoting Carroll v. United States , 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Toward the end of its opinion, the majority cites this court's decision in Burnside and states, "Thus, we conclude that the trial court's denial of the motion to suppress was supported by competent, credible evidence." Majority opinion at ¶ 19, citing 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71. This statement is perplexing for a couple of reasons. First, it shows that the majority has applied the competent-and-credible-evidence standard that we use when reviewing a trial court's factual determinations to its review of the ultimate legal question, which is supposed to be de novo. The statement reflects a lack of understanding regarding proper appellate review of suppression rulings. Second, at no point in its opinion does the majority take the time to actually look at the evidence supporting the trial court's decision and determine that it is in fact competent and credible.

The chief justice's dissenting opinion also highlights how Officer Moore equivocated when testifying about the suspected location of the gunfire and emphasizes that his police report specifies only that the gunfire came from the "west." Again, if nothing more than a person's presence near the location of suspected criminal activity can give rise to reasonable suspicion of that person, then there must be competent and credible evidence supporting the fact that the officers' determination of the location is more than a mere guess. Officer Moore's lack of specificity and continual equivocation undermine the factual credibility determination that the trial court made in this case.

This is not to say that police officers investigating suspected criminal activity cannot approach an individual to ask questions or to secure a scene. It also goes without saying that an officer would reasonably have his weapon at the ready when investigating suspected gunfire. To be clear, this opinion is restricted to a constitutional analysis of whether evidence obtained from the officers' stop of Hairston and their subsequent search of him should be suppressed on Fourth Amendment grounds. It is not a weigh-in on the procedures or protocols of policing.