NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0236n.06

Case No. 23-1293

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="2"><strong>FILED</strong><br>Jun 04, 2024<br>KELLY L. STEPHENS, Clerk</td></tr>
<tr><td>    Plaintiff-Appellee,</td><td>)<br>)</td></tr>
<tr><td></td><td>)</td><td>ON APPEAL FROM THE UNITED</td></tr>
<tr><td>v.</td><td>)</td><td>STATES DISTRICT COURT FOR</td></tr>
<tr><td></td><td>)</td><td>THE EASTERN DISTRICT OF</td></tr>
<tr><td>NOE GARZA,</td><td>)</td><td>MICHIGAN</td></tr>
<tr><td>    Defendant-Appellant.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>OPINION</td></tr>
</table>

Before: SUTTON, Chief Judge; McKEAGUE and BUSH, Circuit Judges.

SUTTON, Chief Judge. After store employees reported that a shoplifter had fled their store and entered a white Pontiac, police pulled defendant Noe Garza from the car and arrested him. Inside his pockets and the car, they found drugs, stolen merchandise, and a gun. Over Garza's objections, the district court admitted this evidence at trial and allowed an expert to testify about the meaning of firearm-related terminology. Seeing no error in the district court's handling of the evidence or the case, we affirm.

I.

On Thanksgiving Day in 2020, two police officers arrived at a Meijer grocery store to investigate a shoplifting incident. While speaking with members of the loss prevention team, they learned that employees had just spotted another individual stealing merchandise and concealing it. They described the suspect as a white male wearing gray pants and a gray sweatshirt. A Meijer

employee stopped the suspect at the door. The suspect turned over some of the stolen property, but he did not allow the employee to look inside his backpack for other merchandise. The employee told the police that the suspect had just entered a white Pontiac Grand Prix in the parking lot and pointed to it.

Officers approached the vehicle. At first, they saw only Noe Garza sitting in the driver's seat. Garza's clothes did not match the description offered by store employees. The officers ordered Garza out of the car and handcuffed him. A search of his pockets revealed 17 Suboxone (buprenorphine) sublingual tablets and lots of cash.

Police noticed a second person in the car sitting in the backseat next to a backpack. The officers removed him from the car and handcuffed him. The backseat passenger identified himself as Robert Hutchins. After police placed Garza in the patrol car, Hutchins asked to speak with the officers. He admitted to stealing merchandise from Meijer and told them that they would find stolen goods in the car. He told them that Garza was a drug dealer and had a gun in the car. Hutchins said that a cohort remained in the store stealing merchandise, and he described him. After calling for backup, the police reentered Meijer and found the man described by Hutchins. He too had stolen merchandise concealed in his pockets. The officers secured all three suspects in patrol cars.

Based on the information supplied by Hutchins, the police searched the Grand Prix, looking for "merchandise, drugs, and a gun." R.22 at 40. Along with stolen goods, they found methamphetamine, marijuana, Suboxone tablets, drug paraphernalia, and a live round of nine-millimeter ammunition between the driver's seat and center console. After Garza identified himself, the officers discovered that he had active warrants out for his arrest. The car, claimed by Garza to be his, bore plates associated with a different vehicle. The officers ordered the car to be

towed to an impound lot. Then they took Garza, Hutchins, and the third suspect to the police station.

When questioned at the police station, Hutchins reiterated that Garza had a gun when the trio went to Meijer. The third suspect said that he saw Garza put something near the engine earlier that day, and "it may have been a gun." *Id.* at 55. Based on these statements, two officers went to the impound lot and conducted a second search of the car. They opened the car's hood and found a gun concealed behind the battery. It was a nine-millimeter Ruger semiautomatic pistol with a scratched-out serial number and an extended magazine.

A grand jury indicted Garza on three counts: (1) possessing a firearm and ammunition as a felon, 18 U.S.C. § 922(g)(1); (2) possessing a firearm with an obliterated serial number, *id.* § 922(k); and (3) distributing buprenorphine, a controlled substance, 21 U.S.C. § 841(a).

Garza filed a motion to suppress all of the evidence obtained from the search of him and the car. The court rejected the motion on the ground that the police inevitably would have discovered, or did in fact discover, all the evidence through lawful means.

To help prove that Garza possessed the gun, the government introduced at trial a recorded jail call Garza made to his girlfriend. In the call, Garza tells her that "I still got the stick" because the "Metro police never found my f***ing banger." Gov't Ex. 11B. He also said his mom had "one of my bangers" that had "a stick on it." Gov't Ex. 11C. At that point, Garza did not know that the police had found his gun after the second search. The government called as a witness an agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives to explain that the term "banger" usually means a pistol and a "stick" refers to an extended magazine. R.72 at 142.

A jury convicted Garza on all counts. The district court sentenced him to 80 months.

II.

Garza argues that the evidence from the search of him and the car should be suppressed. We review the district court's fact findings for clear error and its answers to any legal questions with fresh eyes. *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. While the amendment does not say anything about the admission of evidence at trial, the Supreme Court has created an exclusionary rule to protect Fourth Amendment rights. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The exclusionary rule forbids the government from introducing evidence obtained in violation of the Fourth Amendment when "the deterrence benefits of suppression . . . outweigh its heavy costs." *Davis v. United States*, 564 U.S. 229, 237 (2011).

This case implicates two qualifications to the exclusionary rule. One is the inevitable discovery doctrine—that courts will not suppress evidence that "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). The other is the independent source doctrine—that courts will not suppress evidence discovered "by means wholly independent of any constitutional violation." *Id.* at 443.

The two doctrines overlap but are not identical. What separates them are cause and effect. If the evidence was discovered solely because of an unconstitutional search, courts look to the inevitable discovery doctrine and ask whether police inevitably *would* have discovered the evidence through lawful means. If the evidence was not discovered through an unconstitutional search, courts look to whether the independent source for the evidence was lawful. If law enforcement inevitably would have found the evidence, or did in fact find the evidence, through lawful means, the government may introduce it at trial. *See United States v. Figueredo-Diaz*, 718

4

F.3d 568, 574–76 (6th Cir. 2013). In both circumstances, "the deterrence rationale" has "little basis," and the exclusionary rule does not apply. *Nix*, 467 U.S. at 444.

Because the police inevitably would have found all the evidence at issue—or did find it independently of any questionable searches—we uphold the district court's rulings.

*The search of Garza's pockets.* The initial search of Garza's pockets began on an unsteady foot. Garza did not match the description offered by the Meijer employees. And the officers did not see a backpack near him. Under these circumstances, it's not clear whether the police had a right to pull him out of the car and arrest him without anything further. But we need not resolve the point, as the officers inevitably would have discovered the same evidence through lawful means.

Either way, the officers had authority to briefly detain Garza and inquire about his identity. The police may briefly stop an individual to investigate him so long as they have a "reasonable suspicion" that he is involved with criminal activity. *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004); *see Terry v. Ohio*, 392 U.S. 1, 20–22 (1968). And the police may ask suspects to identify themselves during these brief investigatory stops. *Hiibel*, 542 U.S. at 186.

Gauged by these principles, the police would have legally discovered what was in Garza's pockets. The police reasonably suspected Garza's involvement in criminal activity, as he sat in the driver's seat of a car that witnesses identified as the getaway car. *See United States v. Young*, 707 F.3d 598, 603–04 (6th Cir. 2012). Garza then identified himself to the officers. Consistent with their routine procedures, the police ran a check for outstanding arrest warrants. *See United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002). Two active warrants for Garza's arrest emerged. These warrants gave officers "an obligation to arrest" Garza, and upon his arrest it became "undisputedly lawful to search [him] as an incident of his arrest." *Utah v. Strieff*, 579 U.S.

232, 240–41 (2016). On this record, the police inevitably would have found the drugs and cash in Garza's pockets.

Garza pushes back. He argues that the officers lacked probable cause to connect him to any crime. But he overstates the prerequisites for an investigatory stop. Officers do not need probable cause to make a *Terry* stop. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (describing reasonable suspicion as "a minimal level of objective justification"); *United States v. Hensley*, 469 U.S. 221, 229 (1985) (reasoning that "the ability to briefly stop [a] person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice"). Officers need only "articulable facts supporting a reasonable suspicion" of Garza's involvement with criminal activity to briefly detain him and ask for his identification. *Hayes v. Florida*, 470 U.S. 811, 816 (1985). The officers knew more than enough "articulable facts" to generate a reasonable suspicion of his involvement. Employees reported a theft in the store and that the shoplifter got into a white Pontiac Grand Prix, and police found Garza sitting in the exact car. *See Navarette v. California*, 572 U.S. 393, 398–402 (2014). That suffices.

*Vehicle search in the parking lot.* Next up is whether the evidence uncovered during the search of the car in the parking lot should be excluded. The police do not need a warrant to search a car if they have probable cause to believe the car has "contraband or evidence of criminal activity." *United States v. Alexander*, 954 F.3d 910, 917 (6th Cir. 2020) (quotation omitted); *see Caroll v. United States*, 267 U.S. 132, 153–54 (1925). The police had just that. Hutchins admitted to a theft and told police he had stolen merchandise in the car. Hutchins also told the police that Garza was a drug dealer and had a gun. Before searching the car, the officers verified one part of

Hutchins' story—that a third person was still inside the store stealing merchandise. Hutchins' statements gave officers a lawful basis for the search.

Garza responds that the information from Hutchins grew out of the initial contact with police. Without that arrest, he notes, the police never would have noticed Hutchins. But the record does not support this conclusion. Even though police found Hutchins after handcuffing Garza, no evidence shows that they found Hutchins *because of* Garza's arrest. The officers found Hutchins "wholly apart from their detention of [Garza]" by looking through the car's windows and seeing him in the backseat. *Figueredo-Diaz*, 718 F.3d at 575. If anything, Garza's arrest delayed that discovery, not prompted it, as the officers found Hutchins soon after securing Garza.

*Search of the car at the impound lot.* Garza also challenges the second search of the car at the impound lot. Here, too, the court properly admitted the evidence. Hutchins told the police that Garza had a gun, and he reiterated that point at the police station. The third suspect told the police that he saw Garza put something near the engine that "may have been a gun." R.22 at 55. Those statements justified a second search of the car to look for the firearm. *See Florida v. Meyers*, 466 U.S. 380, 382 (1984).

Garza attempts to cabin the scope of the officers' search by limiting it to areas where officers would routinely check during an "inventory" search. But this ignores *Florida v. Meyers*. With probable cause, officers may search a car in police custody for evidence of a crime. *Id.*

### III.

*Expert testimony.* Switching gears, Garza contests the district court's decision to allow an ATF agent to give expert testimony about the meaning of "banger" and "stick." The Federal Rules of Evidence permit opinion testimony by those "qualified as an expert" through their education or experience. Fed. R. Evid. 702. The party offering the witness must show that the expert's

knowledge will help the jury understand the evidence and that the expert's testimony has sufficient support, stems from reliable methods, and reflects a reliable application of those methods. *Id.* Courts "routinely" find that law enforcement officers can qualify as expert witnesses to interpret "slang" and "street language." *United States v. Gardner*, 32 F.4th 504, 520 (6th Cir. 2022); *see United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015). We review the district court's ruling for an abuse of discretion. *Gardner*, 32 F.4th at 519.

The district court properly admitted this testimony. Before allowing the jury to hear it, the court assessed the agent's expertise and proffered testimony to ensure compliance with the Rules of Evidence. *See* Fed. R. Evid. 104(a). The ATF agent testified that he had worked in law enforcement since 2009 and had years of experience on special task forces investigating violent crimes. As part of his training, he learned the "different ways people refer to firearms." R.71 at 9. The agent also described numerous instances in which informants, witnesses, victims, or perpetrators used "banger" or "stick" in connection with "reference[s] to a firearm." *Id.* at 24–27. This more than qualified him to testify about the meaning of the words. *See Gardner*, 32 F.4th at 519–20 (holding that an ATF agent with over a decade of experience could testify about drug terminology); *United States v. Maya*, 966 F.3d 493, 505 (6th Cir. 2020) (similar).

Garza responds that the ATF agent did not adequately explain why Garza's use of "banger" and "stick" referred to firearms. Not so. In addition to explaining the typical meaning of the terms, the agent pointed out that Garza's specific use of the phrase "my banger" with a "stick on it" indicated a pistol with an extended magazine. R.72 at 86, 144. The district court did not abuse its discretion by permitting the introduction of this testimony.

We affirm.